The National Auction Group, Inc., is a defendant in an action filed by Donald D. Hammett in the Etowah Circuit Court. National Auction Group appeals from the denial of its motion to compel arbitration. We affirm.
 Background
In September 2000, National Auction Group and Ralph Pinson, as president of Grande Ventures Development Co., L.L.C., entered into an "Exclusive Right to Sell Listing Agreement for Real Estate" (hereinafter referred to as the "listing agreement"). The listing agreement gave National Auction Group the exclusive right to sell numerous condominium units at the Perdido Grande Condominiums in Orange Beach, Alabama, which units were purportedly owned by Grande Ventures. National Auction Group was to sell the condominiums by absolute auction to be held on December 9, 2000.[1]
Attached to the listing agreement was a separate arbitration agreement; that arbitration agreement provided, in pertinent part:
 "1. AGREEMENT. Any dispute(s) pertaining to legal controversies and other matters and questions arising out of or relating to the auction made the subject of this agreement by The National Auction Group, Inc., an Alabama corporation, hereinafter referred to as `NAG,' and the Seller, including but not limited to, the terms of this agreement, representation[s], promises, undertakings or covenants made relating to the agreement or any amendments or other documents or legal agreements executed in conjunction with the auction agreement, services provided under the auction agreement, and the validity and construction of this arbitration provision not resolved within Thirty (30) days, *Page 67 
shall be resolved solely and exclusively by arbitration in accordance with the commercial rules of [the] America[n] Arbitration Association. The parties agree to be bound by the result as their SOLE remedy.
 "2. SCOPE. Arbitration shall apply to ANY dispute between the parties concerning questions of law or fact or both arising out of or relating to this agreement, its performance, or its alleged breach, which is not disposed of by agreement of the parties within Thirty (30) days."
Ralph Pinson, as president of Grande Ventures, and National Auction Group were the only parties to the listing agreement; those same parties also executed the arbitration agreement.
National Auction Group conducted the auction as scheduled on December 9, 2000. Hammett's bid was the highest bid for condominium unit 302; the owner of that condominium unit had the use of boat slip 48. Hammett and Ralph Pinson and Julie Pinson (Ralph Pinson and Julie Pinson are hereinafter sometimes referred to as "the Pinsons") entered into, on that same date, a "Real Estate Purchase and Sale Agreement" (hereinafter referred to as "the purchase agreement"). Pursuant to the terms of the purchase agreement, the Pinsons were to convey to Hammett by warranty deed condominium unit 302 for the sum of $253,600. As required by the purchase agreement, Hammett deposited with the escrow agent the amount of $25,360, representing 10% of the total purchase price.
The purchase agreement expressly mentioned National Auction Group and acknowledged that National Auction Group was involved in the transaction. (After expressly referring to National Auction Group by its full name, the purchase agreement then referred to National Auction Group as the "Auction Company.") The purchase agreement provided that, in the event Hammett defaulted, National Auction Group would be entitled to retain 50 percent of Hammett's deposit. The purchase agreement further provided:
 "DISCLAIMER AS TO [NATIONAL AUCTION GROUP]: Buyer shall look only to Seller as to all matters regarding this Agreement and the Property. The [National Auction Group] shall not be responsible or liable in any way (i) if Seller fails or refuses to or cannot close title hereunder or (ii) if the Property is affected in any way, is in need of attention or repairs or is in any other way unsatisfactory to Buyer as Buyer may determine before or after closing."
(Capitalization in original.) Only the Pinsons and Hammett signed the purchase agreement; National Auction Group was not a signatory to the purchase agreement.
On October 24, 2001, Hammett sued the Pinsons and National Auction Group. Hammett alleged in his complaint that, after entering into the purchase agreement, he learned that the Pinsons did not own unit 302 in the Perdido Grande Condominiums. He alleged that the true owner of unit 302 had no connection with the Pinsons and that the Pinsons had no authority to include unit 302 in the auction conducted on December 9, 2000. Hammett also alleged that both the Pinsons and National Auction Group knew or should have known before December 9, 2000, the date Hammett placed his bid on the condominium and entered into the purchase agreement, that the Pinsons did not own unit 302.
In his complaint, Hammett alleged that the Pinsons were liable on theories of fraud, suppression, conspiracy, and breach of the purchase agreement. Against National Auction Group, Hammett alleged *Page 68 
breach of the purchase agreement,[2] fraud,[3] suppression,[4]
negligence,[5] deceit, and conspiracy.[6] A default judgment was entered against the Pinsons; the trial court awarded Hammett $134,114.55 in compensatory damages.[7]
In answer to Hammett's complaint, National Auction Group filed a "Motion to Stay Proceedings and to Compel Arbitration," asserting that Hammett was bound by the arbitration agreement signed by National Auction Group in conjunction with the listing agreement. The trial court denied that motion.
National Auction Group appeals, making the following claims:
 I. That Hammett's claims against National Auction Group can be based only upon his status as a third-party beneficiary to the listing agreement between National Auction Group and Ralph Pinson, which contained the arbitration agreement.
 II. That the Federal Arbitration Act mandates the enforcement of the arbitration agreement attached to the listing agreement because, it says, the agreement is in writing and evidences a transaction involving commerce.
 Standard of Review
A direct appeal is the appropriate manner in which to seek review of a trial court's order granting or denying a motion to compel arbitration. See Rule 4(d), Ala.R.App.P.; Credit Sales, Inc. v. Crimm, 815 So.2d 540,544 (Ala. 2001); Equifirst Corp. v. Ware, 808 So.2d 1, 4 (Ala. 2001). On appeal, this Court's review of a trial court's denial of a motion to compel arbitration is de novo. Equifirst Corp., 808 So.2d at 4.
 Analysis
As the party seeking to compel arbitration, National Auction Group has the initial burden of proving the existence of a contract calling for arbitration of the claims of the plaintiff, who, in this case, is a nonsignatory to the contract that includes the arbitration agreement. This burden is imposed upon the party seeking to compel arbitration because "`"a party cannot be required to submit to arbitration any dispute he has not agreed to *Page 69 
submit."'" Cook's Pest Control, Inc. v. Boykin, 807 So.2d 524, 526 (Ala. 2001) (quoting Old Republic Ins. Co. v. Lanier, 644 So.2d 1258, 1260
(Ala. 1994), quoting in turn A.G. Edwards Sons, Inc. v. Clark,558 So.2d 358, 362 (Ala. 1990)).
National Auction Group argues that although Hammett is not a signatory to the listing agreement — the only contract containing an arbitration agreement — he should be required to arbitrate his claims. National Auction Group argues that because the listing agreement is the only contract to which National Auction Group is a party, and because Hammett's complaint alleges a breach-of-contract claim, Hammett must be suing National Auction Group in his capacity as a third-party beneficiary of the listing agreement. National Auction Group argues that, therefore, Hammett should be compelled to arbitrate his dispute, because:
 "[Hammett's] breach of contract claim against [National Auction Group] can only be based upon his status as a third-party beneficiary of the Listing Agreement. All of [Hammett's] other claims against [National Auction Group] also arise from, and cannot be proven without reference to, the Listing Agreement. Moreover, the Listing Agreement was the only contract in effect at the time of the events giving rise to the allegations in [Hammett's] Complaint."
(National Auction Group's Brief, at 11.)
However, Hammett responds that his claims against National Auction Group are not based upon the listing agreement or upon any other contract containing an arbitration agreement. Hammett asserts that his claims arise out of representations made to him concerning the title to unit 302 and arise out of the alleged breach of the purchase agreement. Hammett points out that his complaint does not reference the listing agreement but instead expressly identifies the purchase agreement as the "agreement" made the basis of his complaint and thereby the basis of his breach-of-contract claim.[8]
Our review of the complaint indicates that Hammett is not attempting to "accept the benefits of the Listing Agreement without being bound by all of its terms," as National Auction Group alleges. (National Auction Group's Brief, at 11.) See, e.g., Equifirst Corp. v. Ware, supra (the fact that the daughter lived in the mobile home with her mother did not automatically transform the daughter into a third-party beneficiary of the mortgage agreement; the daughter's tort claims did not seek to enforce any part of the mortgage agreement); Cook's Pest Control, Inc.v. Boykin, supra (a hospital patient was not a third-party beneficiary of a contract between the hospital and a pest-control company, and the patient was not subject to an arbitration provision contained in that contract where the patient's negligence claims were independent of the contractual obligations of the hospital and the pest-control company, the patient removed all claims from her complaint that depended upon the contract between the hospital and the pest-control company, and the arbitration provision contained in that contract encompassed only the hospital and the pest-control company). Hammett's complaint attempts to state claims based only upon National Auction Group's advertisement of *Page 70 
the property to be auctioned, the events surrounding the December 9, 2000, auction, and the relationships and contracts resulting from Hammett's bid at the auction. Further, the listing agreement is not referenced in the complaint. In fact, the complaint specifically identifies the purchase agreement as the contract made the basis of Hammett's breach-of-contract claim.
We cannot assume, as National Auction Group urges, that simply because National Auction Group is a signatory to the listing agreement but not to the purchase agreement, Hammett must be suing National Auction Group for an alleged breach of the listing agreement. This is particularly true when Hammett's complaint expressly states that his breach-of-contract claim is based upon an alleged breach of the purchase agreement, not upon an alleged breach of the listing agreement. Because a plaintiff is in control of his or her complaint, we accept Hammett's allegations on their face.
We express no opinion on the merits of Hammett's theory of liability against National Auction Group or the effect of the disclaimer contained in the purchase agreement on Hammett's right to sue National Auction Group. If the trial court determines that Hammett's breach-of-contract claim against National Auction Group lacks merit, that claim will be subject to dismissal. However, that issue is not now before us. The only issue before us is whether the trial court properly denied National Auction Group's motion to compel arbitration. We conclude that National Auction Group's motion to compel arbitration was properly denied because National Auction Group has failed to establish the existence of any contract by which Hammett agreed to submit to arbitration a dispute with National Auction Group arising out of the auction and sale of unit 302.
The narrow scope of the arbitration agreement attached to the listing agreement also serves as an independent basis for affirming the trial court's order denying National Auction Group's motion to compel arbitration. The application of that arbitration agreement is limited to disputes between the parties to the listing agreement concerning questions of law or fact, or both, arising out of or relating to the listing agreement, the parties' performance under that agreement, or an alleged breach of that agreement. As we held in Cook's Pest Control,Inc., supra, the signatory to the arbitration agreement (National Auction Group) is attempting to enforce the arbitration agreement beyond its scope. As Hammett correctly argues, National Auction Group's motion to compel arbitration fails for this reason as well. See Cook's PestControl, 807 So.2d at 527, citing Smith v. Equifax Servs., Inc.,537 So.2d 463, 465 (Ala. 1988).
 Conclusion
We affirm the trial court's denial of National Auction Group's motion to compel arbitration.
AFFIRMED.
Moore, C.J., and See, Brown, and Harwood, JJ., concur.
[1] An absolute auction is "[a]n auction in which the property will be sold to the highest bidder, no minimum price will limit bidding, the owner may not withdraw property after the first bid is received, the owner may not reject any bids, and the owner may not nullify the bidding by outbidding all other bidders." Black's Law Dictionary 125-26 (7th ed. 1999).
[2] Count IV of the complaint alleges that National Auction Group breached the purchase agreement. The complaint does not specify exactly how National Auction Group might have breached that agreement, to which it was not a signatory. However, the complaint alleges that National Auction Group advertised unit 302 and boat slip 48 as being for sale to the highest bidder; that National Auction Group knew or should have known that the Pinsons did not own unit 302; and that National Auction Group held itself out as the agent of the sellers of unit 302, who National Auction Group represented were the Pinsons. The complaint also alleges that National Auction Group failed to honor the purchase agreement.
[3] Count V alleges that National Auction Group misrepresented that unit 302 was to be sold to the highest bidder and that the Pinsons owned unit 302.
[4] Count VI alleges that National Auction Group suppressed from Hammett the fact that the Pinsons did not own unit 302.
[5] Count VII alleges that National Auction Group negligently failed to perform a title search and/or to obtain proper title information for the condominium units it was auctioning.
[6] Count IX alleges that National Auction Group and the Pinsons conspired to damage the potential purchasers at the auction by misrepresenting to, or suppressing from, them material facts.
[7] Neither the Pinsons nor the judgment entered against them are involved in this appeal.
[8] Hammett contends that the basis for his breach-of-contract claim against National Auction Group is that National Auction Group, although not a party to the purchase agreement, was a third-party beneficiary of that agreement. Therefore, Hammett argues, National Auction Group may be subject to liability for the Pinsons' default under that agreement. *Page 71